**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| R4 PROPERTIES, et al., | : | |
| Plaintiffs, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 3:09-CV-400 (JCH) |
| | : | |
| JOHN RIFFICE and KAREN RIFFICE, | : | JUNE 16, 2015 |
| Defendants. | : | |

**BENCH RULING**

## I.   INTRODUCTION

Plaintiffs R4 Properties ("R4"), Michael A. Riffice, and Ann Marie Riffice

(collectively, "the plaintiffs") brought this action alleging that defendants John and Karen

Riffice wrongfully dissociated from R4, a partnership created by Michael, Ann, John,

and Karen[1] in their Joint Venture and Joint Operating Agreement (the "Agreement").

See Amended Complaint ("Am. Compl.") (Doc. No. 17), Count I; see also Complaint

("Compl."), Ex. A (Doc. No. 1-2) (showing a copy of the Agreement).  The plaintiffs

contend that the defendants are obligated to settle their account balances with R4

because they dissociated from the partnership with negative partnership balances.  The

parties agree that, based on their Agreement, Florida law governs the dispute.  See

Memorandum of Decision and Order ("Mem. Decision") (Doc. No. 63) at 1.

As explained in the following discussion, the court finds that, as of October 27,

2008, the date of dissociation, the buyout price of each of R4's two-bedroom units,

Siena 1009 and Siena 1015, was $200,000, and the buyout price of each of R4's three-

bedroom units, Siena 1011 and Siena 1013, was $223,000.  Additionally, the court rules

---

[1]  To avoid confusion, the court refers to the parties by their first names.

that the plaintiffs are not entitled to attorney's fees.  Accordingly, the court enters

Judgment in favor of the plaintiffs against each defendant for $114,313, for a total of

amount of $228,626.

## II.   BACKGROUND

In September 2014, this court (Squatrito, J.) issued a Memorandum of Decision

and Order (Doc. No. 63) addressing the parties' cross-Motions for Summary Judgment

(Doc. Nos. 45, 48).  The court briefly recounts the facts and rulings that were discussed

in the Memorandum of Decision and Order only to the extent necessary to understand

this Ruling.  See Mem. Decision 2–4, 9, 15–16, 20.

In July 2005, Michael and his wife, Ann, formed R4 with Michael's brother, John,

and John's wife, Karen.  The Riffices formed R4 to own and manage residential

properties in Celebration, Florida.  Under the Agreement, the partnership would manage

the properties, and the parties could agree to sell some or all of the properties.  R4 was

to continue until the properties were sold or all the parties agreed in writing to its

termination.

The parties agreed that Michael would borrow money to purchase properties on

R4's behalf.  He acquired four properties in Celebration, Florida, for a total of

$1,214,000.  For three of the properties, Michael and Ann financed 100% of the cost

with loans.  He and Ann also financed 95% of the fourth property, and R4 contributed

the remaining 5% ($14,350) with capital contributions from the four partners.[2]

---

[2] At the bench trial, Michael Riffice appeared to testify that each couple put down 5% of the purchase price of the fourth property, i.e., he and Ann put down 5% and John and Karen put down another 5%.  At the summary judgment phase, the parties did not dispute that Michael financed 95% of the fourth property with R4 contributing the remaining amount.  See Pls.' Local Rule 56(a)1 Statement

According to the Agreement, R4's properties were "to be acquired in the names of Michael A. and Ann Marie Riffice and shall be held by them for and on behalf of R4 Properties as if R4 Properties held the properties in its own name."

R4's four properties posted losses in 2006 and 2007.  In July 2008, John and Karen told Michael and Ann that they could not afford to participate in the partnership. On November 12, 2008, John and Karen sent a letter to Michael stating that October 27, 2008, was the "official date" of their dissociation from R4 and that they would no longer be making any capital contributions.

Interpreting the Florida Revised Uniform Partnership Act ("FRUPA"), the court held that the properties at issue were indeed properties of R4 and that the defendants "owe the partnership the negative value of their partnership accounts" as of the date of their dissociation.  Mem. Decision 16.  It then concluded that the "case will proceed only as to a determination of the amount of the defendants' negative account balances owed to the partnership."  Id. at 20.

In accordance with the Memorandum of Decision regarding the parties' cross-Motions for Summary Judgment, the court held a bench trial to determine the amount of the defendants' partnership account values.  Because this amount is essentially determined by the value of R4's properties on October 27, 2008, the date of the defendants' dissociation, the court must determine what those properties were worth as of that date.

---

(Doc. No. 49) at ¶¶ 23–24; Defs.' Local Rule 56(a)2 Statement (Doc. No. 56) at ¶¶ 23–24.  In any event, this difference between the testimony and the facts as stated in the Memorandum of Decision is immaterial to the court's Ruling because the parties stipulated to the values of John's and Karen's capital accounts as of the date of dissociation.  See Part IV, infra.

III.    **FINDINGS**

Based on the testimony presented at the bench trial, the court finds that, as of

October 27, 2008, the buyout price of each of R4's two-bedroom units, Siena 1009 and

1015, was $200,000, and the buyout price of each of R4's three-bedroom units, Siena

1011 and 1013, was $223,000.

At the threshold, the court points out that the date of dissociation was in the midst

of the 2008 financial crisis.  To the extent possible, the court's goal is to find the value

that a willing seller and a willing buyer would have agreed to on the date of dissociation,

not knowing with any certainty what the coming months would bring.  Put simply:  the

court does its best to avoid hindsight bias.

The court generally found the testimony of the defense expert, Michael Fabbiani,

to be helpful.  Fabbiani is a licensed appraiser, and he has extensive experience doing

appraisals.  Not only does Mr. Fabbiani have extensive experience as an appraiser

generally, but he has also had significant experience appraising property values in the

Celebration community.  Further, the court credits his testimony that John and Karen did

not tell him why they wanted an appraisal, so the court has no reason to believe he was

intentionally inflating the property value.  Fabbiani affirmed the finding he had made in a

report produced in October 2008, testifying that the fair market value[3] of Siena 1009,

one of R4's two-bedroom properties, was $255,000 as of the effective date of his report.

─────────────────────

[3] Plaintiffs sought to strike all of Fabbiani's testimony on the ground that it related to the
properties' "fair market value" instead of their "buyout prices" because the latter term is the one used in
the relevant statute.  See Fla. Stat. §§ 620.8701(1), (2).  Uniform Comment 3 to section 620.8701 states
that the term "fair market value" was not used in the statute because it is often a context-specific term of
art.  The Comment continues to explain that the buyout price is "not intended to mean distress sale
value."  See id. cmt.3.  Rather, the appropriate value is "the price that a willing and informed buyer would

Although useful, the court declines to simply adopt Fabbiani's valuation.  First, Fabbiani testified that his report was effective as of October 8, 2008.  The defendants did not dissociate until October 27, 2008.  Fabbiani stated that he did not consider any data after the effective date of his report, and he explained that it would be inappropriate to consider data that exist after an appraisal's effective date when later assessing the accuracy such an appraisal.  This presents an issue in using an early-October appraisal to determine a late-October property valuation because all witnesses testified, explicitly or implicitly, that during October 2008, the real estate market in Florida was in decline.[4]  Indeed, Fabbiani himself testified that the real estate market in Celebration was declining as of the date of his appraisal.  Therefore, even if Fabbiani's appraisal of Siena 1009 as of early October 2008 was flawless, the court finds that property's value likely declined by late October 2008.

Second, in the court's view, Fabbiani's opinion – while helpful – is not flawless. Fabbiani testified that, in addition to other factors, he relied on four comparable properties.  The comparable properties were certainly within an acceptable geographic range:  all of the comparable properties were located within one-half to three-quarters of a mile of Siena 1009.  They were also similar in size to Siena 1009, all of them containing approximately 1,450 square feet.  However, the first two comparable properties were sold in May and July 2008.  After Fabbiani's adjustments for certain differences between those properties and Siena 1009, Fabbiani opined that those

_____

pay a willing and informed seller, with neither being under any compulsion to deal."  Id.  Fabbiani testified that this definition was consistent with the "fair market value" he determined in his appraisal.

[4] Of course, the parties disagree on the rate and degree of the market's decline.

properties represented values of $258,000 and $295,000.  The timing of the sales of these properties renders them less weighty in evaluating Siena 1009 as of the date of dissociation.  Fabbiani's third comparable property confirms this:  despite being a similar size to, and in the same area as, Siena 1009 and the other comparable properties, with Fabbiani's adjustments, the property's September 19, 2008, sale yielded a value of $214,500.  The court views Fabbiani's third comparable property as the most helpful. Fabbiani's fourth comparison was a property that neighbored Siena 1009, and it was on sale for $265,000 at the time Fabbiani prepared his report.  The court finds the seller's asking price for this property to be minimally useful in determining the value of Siena 1009.

The plaintiffs offered the testimony of Jenny Martinez and Michael and Ann Riffice.  In contrast to Fabbiani's testimony, Michael and Ann Riffice testified that they believed each of their properties was worth 55 to 60 percent of its purchase price as of October 27, 2008.  Indeed, Ann testified that the Celebration, Florida real estate market generally was down about 50 percent from when R4 purchased the four properties.  R4 purchased each three-bedroom property for $320,000 and each two-bedroom property for $287,000.  Thus, in Michael and Ann's opinions, as of the date of dissociation, each three-bedroom property was worth between $176,000 and $192,000, and each two-bedroom property was worth between $157,850 and $172,200.  Martinez, who testified both as an expert and as a lay witness, opined that each two-bedroom property was worth $162,000 and each three-bedroom property was worth $192,000.

The court gives little weight to these opinions.  The basis for Michael's opinion was that he and Ann met with real estate agents and found comparable properties that

were listed at around $200,000 and not selling.  Michael also testified that an identical

two-bedroom property sold for $125,000.  Finally, he said that a real estate agent

suggested that he could try to list one of his three-bedroom properties for $230,000 and

one of his two-bedroom properties for $200,000 to see if any potential buyers would be

interested.  Ann testified that she spent a weekend in Celebration meeting with real

estate agents and inspecting similar properties.  She stated that she was surprised to

see how inexpensive real estate was, noting three-bedroom, single-family homes were

listed in the mid-$200,000 range.  Further, she testified that she saw a property a few

blocks away that was very similar to one of R4's three-bedroom properties, except that

it contained upgraded fixtures, and it was listed at $220,000 and ultimately sold for

$165,000 in November 2008.  In addition to her weekend in Celebration, she also

compared properties on the Internet.  The court does not doubt Michael's or Ann's

honesty, but it gives their opinions little weight because of their limited personal

knowledge of the relevant real estate market, because some of that knowledge is of a

period after the dissociation date, and most of their knowledge concerned listing

information.  Further, neither has any training in appraising real estate values.

Nor does the court weigh Martinez's opinion heavily.  Martinez is a licensed

realtor in Florida, and she has worked (and continues to work) in the Celebration real

estate market.  Her duties as a realtor include performing "comparative marketing

analyses," suggesting listing prices, and suggesting bidding prices.  She stated that her

opinion as to the value of R4's properties was based on reviewing a report written by

Craig Wallace (a real estate appraiser) – a report that is not in evidence – and viewing

comparable 2008 properties on the Multiple Listing Service ("MLS").  The court finds

Martinez's opinion to be of limited value because she has little appraisal training and because of the retroactive nature of her analysis:  Martinez first saw the Wallace report in 2014, and she conducted her search of 2008 property values on MLS in 2014. Moreover, to the extent Martinez's opinion was simply an affirmation of the Wallace report, it suffers from a similar timing issue as Fabbiani's report:  the Wallace report was issued in November 2008, after the dissociation.  Of more fundamental concern is that Martinez gave little explanation in her testimony for the bases of her opinion that the Wallace report gave an accurate appraisal.  As to Martinez's own efforts to find comparison properties, many of the properties she identified – which she testified were the closest properties she could find – were either significantly smaller or sold as distressed properties.

Taking all of this testimony into consideration, the court concludes that each of R4's two-bedroom properties had a buyout price of $200,000 and each of its three-bedroom properties had a buyout price of $223,000 as of the date of dissociation. Michael, Ann, and Martinez testified that Siena 1009 and Siena 1015, R4's two-bedroom properties, were essentially equal in value.  They said the same was true of Siena 1011 and Siena 1013, R4's three-bedroom properties.  The court arrived at the buyout value for each three-bedroom property by multiplying the value of each two-bedroom property by 1.115:  the purchase price for the three-bedroom units was 11.5% higher than that for the two-bedroom units.  Michael and Ann Riffice each testified that R4's properties had fallen to between 55 and 60 percent of the purchase prices, and Ann said that the Celebration real estate market was generally down by about 50 percent from July 2005, when R4 purchased the properties.  Thus, the plaintiffs do not

appear to contest the use of a "relative" valuation of the three-bedroom properties versus the two-bedroom properties.  The court thus concludes that the properties' values decreased in equal proportion.[5]

## IV.   DAMAGES

The parties submitted a Stipulation Regarding Method of Calculating Damages (Doc. No. 87) in which they explain how to arrive at a total damages figure once the court determines the values of R4's properties as of the date of dissociation.  The parties stipulate to the purchase price of each of R4's properties, the properties' depreciation as of the date of dissociation, the value of each partner's capital account as of the date of dissociation, and the applicable interest rates for the relevant time period.

According to these Stipulations, the parties provided the court with an electronic spreadsheet file that automatically calculates the damages when the court inputs the values it found for each of the four R4 properties.  The court has reviewed the spreadsheet and adopts it as properly calculating the damages according the parties' stipulations.  In light of the parties' stipulations and the court's findings, see Part III, supra, the court awards to the plaintiffs a total of $228,626 as a result of the defendants' dissociation from R4:  $114,313 against John Riffice and $114,313 against Karen Riffice.

---

[5] At the conclusion of the bench trial, the plaintiffs cited Uniroyal, Inc. v. Bd. of Tax Review of Town of Middlebury, 182 Conn. 619 (1981) to argue that the court could not rely on the ratio between the two-bedroom and three-bedroom property's purchase price.  Uniroyal is not analogous:  it discusses Connecticut's statutory requirements in determining assessment values for properties in the context of taxation.  See id. at 623–28.  In any event, the court does not merely rely on the ratio of the purchase prices involved: it relies on the plaintiffs' evidence that the properties' values declined in equal proportion.

**V.     ATTORNEY'S FEES**

The last issue is that of attorney's fees.  The plaintiffs seek reasonable attorney's fees and costs under section 620.8701(9) of the Florida Statutes or, alternatively, Larmoyeux v. Montgomery, 963 So. 2d 813 (Fla. Dist. Ct. App. 2007).  The court considers these arguments in turn.

Section 620.9701(9) states that "[a] dissociated partner may maintain an action against the partnership . . . to determine the buyout price of that partner's interest, any offsets under subsection (3), or other terms of the obligation to purchase," and it allows the court to "assess reasonable attorney's fees and the fees and expenses of appraisers or other experts for a party to the action, in amounts the court finds equitable, against a party that the court finds acted arbitrarily, vexatiously, or not in good faith."  Fla. Stat. § 620.8701(d).  Thus, by its terms, the statute only authorizes the court to assess attorney's fees where a dissociated partner is bringing an action against a partnership and not where, as here, a partnership and its current partners bring an action against former partners that dissociated from the partnership.  Even if it did apply, the court concludes that the defendants did not act "arbitrarily, vexatiously, or not in good faith," which the statute requires for an award of attorney's fees.  Id.

The plaintiffs also seek attorney's fees under Larmoyeux.  Under Florida law, courts generally cannot award attorney's fees without a statutory or contractual basis. Larmoyeux, 963 So. 2d at 818.  The Florida Supreme Court recognized a limited equitable exception to this rule in A.J. Richey Corp. v. Garvey, 182 So. 216 (Fla. 1938). A.J. Richey gives courts equitable discretion to award fees where a partner is "forced to bring suit for dissolution and accounting" against another partner.  Id. at 219.

Larmoyeux held that this equitable exception survived the passage of FRUPA because, under Florida law, common law stands unless the legislature clearly indicates an intent to modify it, and the Florida legislature "did not specifically overrule A.J. Richey." Larmoyeux, 963 So. 2d at 820.  Larmoyeux also held that the equitable exception only applies where the action involves an accounting or something that is fundamentally the equivalent of an accounting.  See id. at 822.  Drawing from Black's Law Dictionary, the court defined an accounting as "'an equitable proceeding for a complete settlement of all partnership affairs.'"  Id. (quoting Cheek v. Bugg, 639 So. 2d 144, 146 n.3 (Fla. Dist. Ct. App. 1994).  The court ultimately affirmed the lower court's award of attorney's fees because the arbitration panel "deliberated on[ ] documentation of the firm's affairs as a whole," which included the firm's financial statements, tax returns, and general ledger. Id. at 821–22.

    The action here is essentially an accounting in the sense that the action seeks to resolve the value of the partners' capital accounts as of the date of dissociation.  The affairs of the partnership as a whole are relevant to that dispute.  While the parties have stipulated to some of the aspects that bear on the ultimate determination of the value of the capital accounts, those stipulations do not change the fundamental nature of the case.  Therefore, under Florida law, the court has discretion to award attorney's fees and costs under A.J. Richey, as explained in Larmoyeux.

    However, the court chooses not to exercise that discretion.  The defendants disputed the value of the relevant properties as of the date of dissociation in good faith. While the court may have the power to award attorney's fees under Florida's common

law, it sees no reason why, in this case, the usual rule that each party is responsible for its own attorney's fees and costs should not apply.

## VI.    CONCLUSION

Based on the foregoing, the court orders that Judgment be entered in favor of plaintiffs in the amount of $228,626.  The court **DENIES** the plaintiffs' request for attorney's fees and costs.


**SO ORDERED.**

Dated at New Haven, Connecticut, this 16th day of June 2015.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge